**EXHIBIT "A"**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re:                                              Chapter 11

OXFORD ASSOCIATES GROUP, INC.,                       Case No. 17-12487 (MKV)

                            Debtor

--------------------------------------------------------x

### ORDER ESTABLISHING BIDDING AND NOTICING PROCEDURES, AND SETTING DATES, IN CONNECTION WITH SALE OF DEBTOR'S INTERESTS IN SHARES OF COOPERATIVE STOCK ALLOCATED TO FIFTY (50) APARTMENTS LOCATED AT 632, 650 AND 678 WARBURTON AVENUE, YONKERS, NEW YORK, TOGETHER WITH THE APPURTENANT PROPRIETARY LEASES AND OCCUPANCY SUBLEASES, FREE AND CLEAR OF ALL LIENS, ENCUMBRANCES AND INTERESTS, <u>SUBJECT TO HIGHER AND BETTER OFFERS</u>

**UPON** the application, dated January 22, 2019 (the "Application"), of Oxford

Associates Group, Inc., the debtor and debtor-in-possession herein (the "Debtor"), and the

exhibits annexed thereto, for entry of an Order establishing bidding and noticing procedures, and

scheduling auction and hearing dates, in connection with the Debtor's sale of certain of its

property (collectively, the "Property") consisting of all of the Debtor's rights, title and interest in

and to 27,942 shares of cooperative stock in Hudson View Owners Corp. allocated in blocks to

fifty (50) apartments (the "Apartments") in the buildings located at 632, 650 and 678 Warburton

Avenue, Yonkers, New York 10701, together with the appurtenant proprietary leases and

existing subleases with occupants of the Apartments, free and clear of all liens, encumbrances

and interests, and subject to higher or better offers; and upon all the pleadings and proceedings

had in this case; and upon the record of the hearing held on _____, 2019 with regard to

the Application; and after due deliberation and sufficient cause appearing therefor; it is

**ORDERED** that the Sale Procedures attached to this Order as *Exhibit "A"* are

hereby approved and all proceedings related to: (a) the submission, consideration, qualification

and acceptance of bids for the Property; (b) the conduct of the Auction (hereinafter defined); and (c) the identification and determination of the Successful Bidder[1] for the Property, shall be governed by and conducted in accordance with the Sale Procedures; and it is further

**ORDERED** that the $3,515,000 offer for the Property made by Benedict Realty Group, LLC (the "Stalking Horse Bidder"), and the corresponding Purchase and Sale Agreement, dated as of January 14, 2019, between the Debtor and the Stalking Horse Bidder attached hereto as *Exhibit "B"* (the "PSA"), are hereby approved as to form; and it is further

**ORDERED** that, in the event that the Debtor receives, by the Qualifying Deadline, one or more submissions that the Debtor determines to be from Pre-Qualified Bidders, the Debtor shall conduct an auction, in accordance with the Sale Procedures, on March 15, 2019 at 10:00 a.m. (Eastern) at the offices of Pick & Zabicki LLP, 369 Lexington Avenue, 12th Floor, New York, New York 10017, for the purpose of determining the highest and best offer for the Property (the "Auction"); and it is further

**ORDERED** that in the event that it is not the Successful Bidder, the Stalking Horse Bidder will receive a break-up fee of $50,000 from the Debtor; and it is further

**ORDERED** that the notice, substantially in the form annexed hereto as *Exhibit "C"*, is hereby approved as to form and shall be served, with the Sale Procedures attached hereto, upon: (a) all known creditors of the Debtor or their counsel if known; (b) the United States Trustee; (c) the Dept. of Treasury - Internal Revenue Service; (d) the New York State Dept. of Taxation and Finance; (e) the New York City Dept. of Finance; (f) the Office of the New York State Attorney General; (g) the Office of the United States Attorney General; (h) the New York City Law Department; (i) the Office of Corporation Counsel for the City of

---

[1] Capitalized terms utilized but not defined herein have the meanings ascribed to them in the Sale Procedures.

2

Yonkers; (j) the Westchester County Department of Law; (k) all persons who have filed notices of appearance in the Debtor's case on or prior to the date hereof; and (l) any person or entity which has shown any interest in acquiring the Property, by first class mail, within five (5) business-days following the entry of this Order; and it is further

ORDERED that BSL Holdings LLC d/b/a Century 21 Schneider Realty shall, as soon hereafter as reasonably practicable, post a listing on its internet website and on LoopNet.com incorporating the material provisions of the attached notices and shall maintain said listing on its website through the conclusion of the Auction; and it is further

ORDERED that the Debtor shall publish a notice concerning the Auction substantially in the form annexed hereto as *Exhibit "D"*, and which notice is hereby approved as to form, in *The Journal News* not less than one (1) time on a date that is not less than seven (7) days prior to the Auction, the costs of such publication the Debtor is hereby authorized to pay; and it is further

ORDERED that service and publication in accordance with the provisions of this Order shall constitute good and sufficient notice of the relief sought and that no other or further notice need be given; and it is further

ORDERED that a hearing be held on March ___, 2019 at 10:00 a.m. (Eastern), before the Honorable Mary Kay Vyskocil, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, to consider the approval of the sale of the Property to the Successful Bidder, together with such other and further relief as may be just and proper; and it is further

ORDERED, that objections if any, to the approval of the sale shall: (a) be made in writing, (b) conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy

Rules for the Southern District of New York, (c) set forth the basis for the objection and the specific grounds therefor, (d) identify the party objecting and its alleged interest in the Debtor's chapter 11 case; (e) be filed with the Court with a copy to the chambers of the Honorable Mary Kay Vyskocil, together with proof of service thereof, and (e) be served in a manner so as to be received by Pick & Zabicki LLP, 369 Lexington Avenue, 12th Floor, New York, New York 10017, not later than March ___, 2019 at 5:00 p.m. (Eastern).

Dated: New York, New York
       _____, 2019

                     _____
                     HONORABLE MARY KAY VYSKOCIL
                     UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT "A" TO BIDDING PROCEDURES ORDER**

## SALE PROCEDURES

Oxford Associates Group, Inc., the debtor and debtor-in-possession (the "Debtor") in a chapter 11 bankruptcy case titled *In re Oxford Associates Group, Inc.*, Case No. 17-12487 (MKV) (the "Bankruptcy Case"), pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), will sell certain of its Property (as hereinafter defined) in accordance with the following Sale Procedures which have been approved by Order of the Bankruptcy Court.

1.    **The Property.**  The property being sold (collectively, the "Property") consists of all of the Debtor's rights, title and interest in and to 27,942 shares of cooperative stock in Hudson View Owners Corp. allocated in blocks to the following fifty (50) apartments (the "Apartments") in the buildings located at 632, 650 and 678 Warburton Avenue, Yonkers, New York 10701, together with the appurtenant proprietary leases and existing subleases with occupants of the Apartments:

- 632 Warburton Avenue – Units 3B, 3C, 3D, 3F, 3J, 3L, 3M, 4C, 4E, 5A, 5K, 6K, 7A, 7B, 7C, 7D, 7E, 7F, 7H and 8A.

- 650 Warburton Avenue – Units 2E, 2F, 2J, 2K, 2L, 3E, 5D, 5I, 5M, 7E, 7J and 7K.

- 678 Warburton Avenue – Units 2E, 2J, 2L, 4F, 4H, 4J, 5D, 5G, 5I, 6A, 6D, 6F, 6H, 6I, 6L, 7D, 7E and 7H.

2.    **Determination of "Pre-Qualified Bidder" Status**.  Any potential bidder (a "Potential Bidder") who wishes to bid to acquire the Property at the Auction (as hereinafter defined) must be pre-qualified by the Debtor (a "Pre-Qualified Bidder").  A Pre-Qualified Bidder is a Potential Bidder who, on or before **March 13, 2019 at 5:00 p.m. (Eastern)** (the "Qualifying Deadline"), delivers the following information/documents, by hand, by nationally recognized overnight mail courier, or by e-mail,  so as to be actually received by Pick & Zabicki LLP, 369 Lexington Avenue, 12th Floor, New York, New York 10017, Attn: Douglas J. Pick, Esq., dpick@picklaw.net:

(a)    The identity of the person or entity that will be bidding for the Property or otherwise participating in connection with such bid on behalf of the Potential Bidder, and the terms of any such participation;

(b)    The Potential Bidder's address, telephone number and e-mail address where the Potential Bidder may be contacted;

(c)    A written statement that the Potential Bidder is financially able and interested in acquiring the Property for a cash price of not less than $3,615,000, without contingencies as to financing and/or additional due diligence, and subject to all material provisions of the PSA (hereinafter defined) (it being understood, however, that the Potential Bidder, while bound to its bid if made at the Auction, shall not be deemed to have made an offer to acquire the Property binding upon the Debtor prior to the time that the Auction is conducted and the sale is approved by the Bankruptcy Court);

(d)     Documents fairly and reasonably demonstrating that the Potential Bidder is financially able to close on its bid to purchase Property if the Potential Bidder should be the Successful Bidder (as hereinafter defined) (*e.g.*, a "proof of funds letter" from a United States bank evidencing an available balance of at least $3,615,000);

(e)     A deposit in certified funds, bank check, or wire transfer (upon instructions from the Debtor's counsel) of not less than $180,750 to be held as a good faith deposit pending the conclusion of the Auction which will be used as a credit toward the Contract Deposit (as hereinafter defined) or returned to the Potential Bidder in the event the Potential Bidder does not submit the Successful Bid (the "Good Faith Deposit");

(f)     A written acknowledgement that, if the Potential Bidder is deemed to have submitted the highest or best bid (the "Successful Bid") for the Property, it shall, within two (2) business days after the Auction, pay to the Debtor in certified funds, bank check, or wire transfer (upon instructions from the Debtor's counsel) the additional funds necessary to increase the Potential Bidder's Good Faith Deposit to an amount equal to ten (10%) percent of the Successful Bid (the "Contract Deposit"), with **TIME BEING OF THE ESSENCE AS TO THE SUCCESSFUL BIDDER'S OBLIGATION TO INCREASE THE DEPOSIT**;

(g)     A written acknowledgement to close on the purchase of the Property if the Potential Bidder's bid at the Auction is selected as the Successful Bid no later than seven (7) business days after entry of an Order by the Bankruptcy Court approving the sale, or on such other date as the Debtor and the Successful Bidder shall otherwise agree to in writing, or as may otherwise be established in accordance with the terms hereof (such date, the "Closing Date"), with **TIME BEING OF THE ESSENCE AS TO THE SUCCESSFUL BIDDER'S OBLIGATION TO CLOSE ON THE CLOSING DATE AND TO PAY THE BALANCE OF THE PURCHASE PRICE AT THE CLOSING**;

(h)     A written acknowledgment that, if such Potential Bidder is determined by the Debtor to have submitted the second highest bid at the Auction (the "Back-up Bid") and, therefore, to be the back-up bidder (the "Back-up Bidder"), and the Debtor determines to proceed with the Back-up Bid after default by the Successful Bidder, to close on the purchase of the Property on the Back-up Closing Date (as hereinafter defined), with **TIME BEING OF THE ESSENCE AS TO THE BACK-UP BIDDER'S OBLIGATION TO CLOSE ON THE BACK-UP CLOSING DATE AND TO PAY THE BALANCE OF THE PURCHASE PRICE AT THE CLOSING**;

(i)     A written acknowledgement that, if the Potential Bidder (i) is the Successful Bidder, that the Good Faith Deposit shall become non-refundable and shall be forfeited to the Debtor as liquidated damages if the Successful Bidder shall fail to close the purchase for any reason whatsoever on the Closing Date; and (ii) is

2

the Back-up Bidder and the Debtor determines to proceed with the Back-up Bid after default by the Successful Bidder, that the Good Faith Deposit shall become non-refundable and shall be forfeited to the Debtor by such Back-up Bidder as liquidated damages if the Back-up Bidder shall fail to close the purchase for any reason whatsoever on the Back-up Closing Date; and

(j)    These Sale Procedures signed by the Potential Bidder acknowledging and agreeing to these Sale Procedures.

3.    **The Opening Bid.**  A $3,515,000 offer for the Property made by a Potential Bidder (the "Stalking Horse Bidder") and a corresponding Purchase and Sale Agreement, dated as of January 14, 2019, between the Debtor and the Stalking Horse Bidder (the "PSA") has been approved by the Bankruptcy Court as to form and shall serve as the opening bid at the Auction (the "Opening Bid").  The Stalking Horse Bidder has already been recognized as a Pre-Qualified Bidder.

4.    **Auction.**  In the event that the Debtor receives, by the Qualifying Deadline, one or more submissions that the Debtor determines to be from Pre-Qualified Bidders, then the Debtor shall conduct an auction with respect to the Property on **March 15, 2019 at 10:00 a.m. (Eastern) at the offices of Pick & Zabicki LLP, 369 Lexington Avenue, 12th Floor, New York, New York 10017** (the "Auction").  The Auction shall be live and in person (*i.e.*, each Pre-Qualified Bidder or its designated representative must attend the Auction) and shall be governed by the following procedures:

(a)    Only representatives of the Debtor and Pre-Qualified Bidders, and their respective counsel, agents and designated representatives, may participate at the Auction, and only such parties, any brokers or auctioneers appointed by Order of the Bankruptcy Court and a stenographer may be present throughout the Auction;

(b)    Only Pre-Qualified Bidders shall be entitled to make any bids at the Auction;

(c)    Each Pre-Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

(d)    Pre-Qualified Bidders shall participate in person or through a duly authorized representative at the Auction;

(e)    Any initial competing bid at the Auction must exceed the Opening Bid by at least $100,000 (*i.e.*, the initial competing bid must be for $3,615,000 or greater) and bidding shall continue thereafter in minimum increments of at least $25,000 higher than the previous bid (or such other amount as may be agreed to by the Debtor, after consultation with its professionals) provided however, the Debtor may decrease bidding increments in its sole discretion in the interest of spurring bidding;

3

(f)     Bids at the Auction must be all cash, without financing or other contingencies, and must be substantially in the form and contain all material provisions of the PSA;

(g)     The Auction shall continue until such time as it appears to the Debtor, in consultation with its professionals, that none of the Pre-Qualified Bidders is prepared to advance the Auction and the Debtor determines the highest and best offer submitted at the Auction from among the Pre-Qualified Bidders (the "Successful Bid") and identifies the maker of the Successful Bid as the successful bidder for the Property (the "Successful Bidder"). In the event of a dispute over which bidder presented the highest and best offer, the Debtor shall choose the top three (3) Pre-Qualified Bidders and the Court shall decide which is the highest and best subject to all parties' right to object.

(h)     If more than one Pre-Qualified Bidder submits a bid in excess of the Opening Bid, after selection of the Successful Bidder, then the Debtor shall determine which such bid constitutes the Back-up Bid;

(i)     In considering bids submitted by Pre-Qualified Bidders at the Auction, the Debtor may request that Pre-Qualified Bidders provide for review by the Debtor at the Auction financial information which fairly and reasonably demonstrate the Pre-Qualified Bidder's ability (and the sources of the said ability) to close on its purchase of the Property if the Pre-Qualified Bidder should be the Successful Bidder based upon the bids submitted at the Auction; and

(j)     Deposits submitted by Pre-Qualified Bidders who do not become the Successful Bidder or Back-up Bidder shall be returned by the Debtor to such Pre-Qualified Bidders within three (3) business days after the Auction, except as otherwise provided herein.

5.    **Obligation to Close and Default**. (a) The Successful Bidder (or, upon consent granted by the Debtor in writing at or prior to the Closing, an assignee or designee of the Successful Bidder) shall close on the purchase of the Property and pay the amount of the Successful Bid, less its Contract Deposit previously posted, on the Closing Date, with **TIME BEING OF THE ESSENCE AS TO THE SUCCESSFUL BIDDER'S OBLIGATION TO CLOSE ON THE CLOSING DATE AND TO PAY THE BALANCE OF THE PURCHASE PRICE AT THE CLOSING**. The Successful Bidder shall be obligated to close title to the Property and there is no contingency of any kind or nature that will permit the Successful Bidder not to proceed at the Closing other than the inability of the Debtor to deliver title to the Property. In the event the Successful Bidder shall fail to timely close the purchase of the Property, the Successful Bidder shall be in default and the Successful Bidder shall forfeit its Contract Deposit to the Debtor. Notwithstanding the foregoing, the Debtor shall have the right, but not the obligation, to extend the time for Closing by the Successful Bidder up to an additional twenty (20) business days (the "Adjourned Closing Period"), with **TIME BEING OF THE ESSENCE** as to the Successful Bidder's obligation to close prior to expiration of

4

the Adjourned Closing Period; and in the event that the Successful Bidder shall fail to close the purchase of the Property prior to expiration of the Adjourned Closing Period, the Successful Bidder shall be in default and the Successful Bidder shall forfeit its Contract Deposit.

(b)     If for any reason the Successful Bidder shall fail to timely close the sale of the Property and the Debtor determines to proceed with the Back-up Bid, the Back-up Bidder (or, upon consent granted by the Debtor in writing at or prior to the Back-up Closing Date, an assignee or designee of the Back-up Bidder) shall close on the purchase of the Property and pay the amount of the Back-up Bid, less its Contract Deposit previously posted, on the later of the Closing Date or seven (7) business days after written notice of the Successful Bidder's default in closing (the "Back-up Closing Date"), with **TIME BEING OF THE ESSENCE AS TO THE BACK-UP BIDDER'S OBLIGATION TO CLOSE ON THE BACK-UP CLOSING DATE AND TO PAY THE BALANCE OF THE PURCHASE PRICE AT THE CLOSING**. If the Debtor proceeds with the Back-up Bid then the Back-up Bidder shall be obligated to close title to the Property and there shall be no contingency of any kind or nature that will permit the Back-up Bidder not to proceed on the Back-up Closing Date other than the inability of the Debtor to deliver title to the Property. In the event the Back-up Bidder shall be obliged, but shall fail, to timely close the purchase of the Property, the Back-up Bidder shall be in default and the Back-up Bidder shall forfeit its Deposit to the Debtor. Notwithstanding the foregoing, the Debtor shall have the right, but not the obligation, to extend the time for Closing by the Back-up Bidder up to an additional twenty (20) business days (the "Adjourned Back-up Closing Period"), with **TIME BEING OF THE ESSENCE** as to the Back-up Bidder's obligation to close prior to the expiration of the Adjourned Back-up Closing Period; and in the event that the Back-up Bidder shall fail to close the purchase of the Property prior to expiration of the Adjourned Back-up Closing Period, the Back-up Bidder shall be in default and the Back-up Bidder shall forfeit its Deposit.

6.     **Deposits of Successful Bidder and Back-up Bidder**.  (a) The Contract Deposit submitted by the Successful Bidder shall be held in escrow by the Debtor's counsel (*i.e.*, Pick & Zabicki LLP), as Escrow Agent (the "Escrow Agent"), pending the closing of the sale. The Successful Bidder's Contract Deposit shall be applied to the sale price upon the closing of the sale, unless the Successful Bidder shall default and fail to close and forfeit its Contract Deposit to the Debtor.

(b)     The Good Faith Deposit submitted by the Back-up Bidder shall be held in escrow by the Escrow Agent until the earlier of (i) the Closing, or (ii) thirty (30) business days after the Auction; provided, however, if the Successful Bidder fails to close and the Debtor decides to proceed with the Back-up Bid, then the Back-up Bidder's Good Faith Deposit shall continue to be held by the Escrow Agent and shall be applied to the sale price upon the closing of the sale on the Back-up Closing Date, unless the Back-up Bidder shall default and fail to close and forfeit its Good Faith Deposit to the Debtor.

7.     **Due Diligence**. Each Potential Bidder is solely responsible for conducting its own due diligence and must complete its due diligence prior to the submission of its bid.

8.      **Reservation of Rights**.  In the interest of maximizing the results realized through the Auction, the Debtor reserves the right, in its business judgment to: (a) modify any of the deadlines set forth in these Sale Procedures; (b) modify or waive, at or prior to the close of the Auction, the procedures and terms and conditions regarding the sale of the Property; and/or (c) adjourn the Auction and/or Closing. Anything to the contrary contained in these Sale Procedures notwithstanding, the Debtor shall have the right, to adjourn the Closing Date or the Back-up Closing Date in order to remedy any defect to title.

9.      **Additional Terms, Conditions and Procedures**.

(a)    The Property is being sold "AS IS", "WHERE IS" in its condition on the Closing Date or the Back-up Closing Date, if applicable, without any representations, covenants, guarantees or warranties by the Debtor of any kind or nature whatsoever (except as may be expressly set forth in the PSA), free and clear of any liens, claims or encumbrances of whatever kind or nature (collectively, the "Liens") accrued through the Closing Date or the Back-up Closing Date, with such Liens, if any, to attach to the proceeds of sale, and subject to any Liens, claims or encumbrances of whatever kind or nature thereafter accrued. Any such Liens, claims or encumbrances of whatever kind or nature accruing after the Closing Date or the Back-up Closing Date shall be the responsibility of the entity acquiring the Property at the Closing, and not the Debtor or its estate.

(b)    By signing these Sale Procedures all Potential Bidders acknowledge that they have had the opportunity to review and inspect the Property, the PSA, and all other relevant documents and information and will rely solely thereon and on their own independent investigation and inspection thereof in making their bid. The Debtor, nor its representatives, including any broker or auctioneer appointed by Order of the Bankruptcy Court, make any representations or warranties with respect to the Property including, without limitation, permissible uses of the Property (except as may be expressly set forth in the PSA). All Potential Bidders acknowledge that they have conducted their own due diligence in connection with the Property and are not relying on any information provided by the Debtor or its professionals.

(c)    Neither the Debtor, or its counsel, or other professionals, is liable or responsible for the payment of fees of any broker or auctioneer except those duly retained by Order of the Bankruptcy Court or as may otherwise be authorized or directed by Order of the Bankruptcy Court.

(d)    By participating in the Auction, all Potential Bidders consent to the jurisdiction of the Bankruptcy Court to determine such disputes in the Bankruptcy Case.  Any disputes concerning the sale of the Property shall be determined by the Bankruptcy Court which shall retain sole and exclusive jurisdiction over all matters relating to the Property, the Debtor and the sale contemplated by these Sale Procedures.

(e)    The Sale is subject to final approval by the Bankruptcy Court at a hearing to be held on **March ____, 2019 at 10:00 a.m. (Eastern)** (or as soon thereafter as practicable), before the Honorable Mary Kay Vyskocil, United States Bankruptcy Judge, at the United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004.

THE UNDERSIGNED POTENTIAL BIDDER HEREBY CONSENTS TO AND AGREES TO BE BOUND BY THE FOREGOING SALE PROCEDURES:

_____
Print Name of Potential Bidder

_____
Print Name and Title of Authorized
Representative of Potential Bidder

_____
Signature of Authorized Representative

_____
Date:

# EXHIBIT "B" TO BIDDING PROCEDURES ORDER

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT is made as of January _14_, 2019 (this "**Agreement**"), between Oxford Associates Group, Inc., a New York Corporation having an address at 5 West 37th Street, New York, New York 10016, ("**Seller**"), and Benedict Realty Group, LLC, a New York limited liability company having an address at 150 Great Neck Road, Suite 402, Great Neck, NY 11201 ("**Purchaser**").

### WITNESSETH:

**WHEREAS**, Seller is the owner of 27,942 shares of stock (the "**Shares**") in Hudson View Owners Corp. (the "**Corporation**") allocated in blocks to Fifty (50) apartments ("**Apartments**") in the building located at 632, 650 and 678 Warburton Avenue, Yonkers, New York 10701 (the "**Premises**"), together with the appurtenant proprietary leases (the "**Leases**"), which units are listed on **Exhibit A** annexed hereto and made a part hereof;

**WHEREAS**, Seller wishes to sell to Purchaser, and Purchaser wishes to purchase from Seller the Shares, and Seller desires to assign to Purchaser and Purchaser desires to accept and assume from Seller the Leases, on the terms and conditions hereinafter set forth.

**NOW THEREFORE**, in consideration of the mutual agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  (A)    **Agreement to Sell**. Seller agrees to sell and convey and Purchaser agrees to buy and acquire, upon the terms and conditions hereof, the Shares and Seller's interest, as lessee, in the Leases, as well as the Personal Property (as hereinafter defined). Seller shall also assign and Purchaser shall assume Seller's interest, as landlord, in those certain subleases listed on **Exhibit B** attached hereto and made a part hereof (the "**Occupancy Leases**") with those tenants (the "**Tenants**") in occupancy of the Apartments on the date of Closing (as hereinafter defined). Purchaser acknowledges having received and read the offering plan to convert the building to cooperative ownership, together with all prior amendments thereto (the "**Plan**") at least three (3) full business days prior to signing this Agreement. Notwithstanding the foregoing, Purchaser acknowledges that this sale does not constitute a public offering of the Shares and Leases, and agrees that none of the representations set forth in the Plan are incorporated into this Agreement, that Seller has no obligation under Article 23-A of the General Business Law of the State of New York to Purchaser, its successors, assigns and/or any other party that may subsequently acquire any of the Shares and Leases, and that no party is a third party beneficiary of this Agreement.

(B)    Purchaser has been advised by Seller that Seller had previously accepted an offer to sell apartment 5-H ("**Apt. 5-H**") to an unrelated third party and that a proposed contract of sale has been sent to such third party but not yet returned to Seller or its agents, along with the required down payment. To the extent that such third party does not return the signed contract of sale and down payment to Seller prior to the Closing hereunder (defined below), Seller expressly reserves the right to include Apt. 5-H onto the list of Apartments (Exhibit A) and upon written notice to Purchaser, to sell the shares of Corporation allocated to such apartment to Purchaser

hereunder, in which event the Purchase Price required hereunder (see below) shall be increased by the sum of $135,000 and the Contract Deposit required hereunder (see below) shall be increased by the sum of $13,500 and the Projected Balance Due at Closing increased by the sum of $121,500.

     2.    Purchaser acknowledges that it is aware that Seller is presently a debtor-in-possession in a Chapter 11 bankruptcy case pending before the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") titled *In re: Oxford Associates Group, Inc.* (Case No. 17-12487 (MKV). This Contract is subject to the approval of the Bankruptcy Court pursuant to a final and non-appealable Order. To the extent that such an Order has not been entered by the Bankruptcy Court as of the date of this Contract, Seller shall file an application therefor with the Bankruptcy Court within fifteen (15) days after receipt of this Contract signed by Purchaser and the tender of the Contact Deposit. Purchaser acknowledges that Seller may seek, or the Bankruptcy Court may direct, approval of this Contract on a public sale basis. In the event of a public sale, Purchaser acknowledges and agrees that its purchase offer for the Shares as provided for under this Contract shall be subject to any higher or better offers that may be tendered to the Seller upon terms approved by the Bankruptcy Court. Purchaser and Seller shall cooperate and comply in good faith with any procedural requirements of the Bankruptcy Court in order to receive the Bankruptcy Court's approval of the sale. In the event that this Contract is not approved by the Bankruptcy Court within ninety (90) days after Seller's receipt of this Contract signed by Purchaser and the tender of the Contract Deposit, Purchaser may terminate this Contract in writing to Seller's attorneys and thereupon the Contract Deposit shall be promptly returned to Purchaser or as Purchaser directs. If prior to the aforesaid 90 day period, or thereafter if Purchaser has not by then terminated this Contract, the Bankruptcy Court approves a sale of the Apartments to a person or entity other than Purchaser, the Contract Deposit shall be promptly returned to Purchaser or as Purchaser directs, together with a "stalking horse" payment of $50,000.00. If the parties are otherwise prevented from closing by any other act by the Bankruptcy Court or other governmental or judicial body or agency, and the Apartments are not sold or transferred, this Contract shall be null and void and the Contract Deposit shall be promptly returned to Purchaser or as Purchaser directs returned to Purchaser in full without set-off or deduction.

     3.    Seller represents that (a) it is the Successor Sponsor and a "holder of unsold shares" as such term is defined in the Plan, in connection with the Shares and Leases; that (b) Corporation has recognized such holder of unsold status of Seller during the term of Seller's ownership of the Shares by inter alia, allowing sales and sublets without application or payment of fees or charges; and that (c) during Seller's ownership of the Shares and Leases; (i) none of the Shares or Leases became the property of a purchaser for bona fide occupancy (by him/herself or a member of his/her family) and (ii) no holder of the Shares (or a member of his/her family) ever became a bona fide occupant of the Apartment. As such, Seller shall seek to obtain the Bankruptcy Court's order providing (x) that the Purchaser hereunder shall be deemed a Successor Sponsor and a holder of unsold shares in regard to each of the Apartments, and (y) for a discontinuance with prejudice of all lawsuits and proceedings by the Corporation against Seller, and that upon payment at the Closing of the balance of the amount due under the agreement as set forth in the 7th amendment to the Plan, with the amount due specified in the order, a termination and discharge of any obligation of Seller and any agreement by Seller for any future payments to the Corporation after the date of Closing and (z) that from and after the Closing, Purchaser has no

obligation to make any payments to the Corporation that were due as of the date of Closing or pursuant to obligations of Seller in existence prior to the Closing. Receipt by Purchaser of the foregoing order is a condition of Purchaser's obligation to close hereunder. However, aside from the foregoing, Seller makes no representation or warranty as to Purchaser's qualification or status as a holder of unsold shares upon or following the Closing hereunder. In addition, Purchaser understands and agrees that Purchaser or any assignee of Purchaser shall be subject to the provisions and requirements of Article 23-A of the New York General Business Law in connection with each subsequent sale of Shares and Leases, including, but not limited to, the obligation to amend the Plan before making or taking part in any public offering of the Shares and Leases.

4.     Personal Property. This sale includes all of Seller's right, title and interest, if any, in and to the refrigerators, ranges, dishwashers, built-in microwaves and other appliances, built-in air-conditioning units, kitchen cabinets and counters, lighting and plumbing fixtures and other articles of property attached to or appurtenant to the Apartments (collectively, the "**Personal Property**"), but only to the extent that Seller, and not any tenants under the Occupancy Leases, or the Corporation, owns such Personal Property. Except as required by law or under the Occupancy Leases or to otherwise comply with Seller's obligations hereunder, Seller is not obligated to install any equipment or appliances in or to any Apartment or property owned by the Corporation or otherwise make any repairs, improvements or decorations to any Apartment or its equipment, appliances or fixtures. Except as provided herein to the contrary, Purchaser is obligated to take title to the Shares and Leases for each Apartment in each Apartment's (and contents) "as-is" physical condition as of the date of conveyance of the Shares and Leases, subject to ordinary wear and tear, in exchange for payment in full as set forth herein (the "**Closing**").

5.     Purchase Price. The purchase price for the Apartments is Three Million Five Hundred Fifteen Thousand ($3,515,000) Dollars (the "**Purchase Price**"), payable as follows:

(a)     Three Hundred Fifty-One Thousand Five Hundred ($351,500) Dollars by check, subject to collection, payable to "Turek Roth Grossman LLP, as attorneys" (the "**Escrow Agent**"), upon the execution and delivery of this Agreement, the proceeds of which will be held in escrow as set forth in Paragraph 20 herein (the "**Contract Deposit**"); and

(b)     Three Million One Hundred Sixty-Three Thousand Five Hundred ($3,163,500) Dollars at Closing by wire transfer of immediately available Federal Funds to Seller's account(s), receipt of which is confirmed at Closing ("**Projected Balance Due at Closing**"). At Seller's option, Purchaser shall deliver separate wires or unendorsed certified or cashier's checks of Purchaser drawn on a commercial bank from a New York City branch in payment of portions of the balance of the Purchase Price which shall be payable to the designees of Seller, provided Seller gives Purchaser at least one (1) business day notice of such designees, the method of payment, and payments to be made.

6.     Seller's Representations. Seller hereby represents, warrants and covenants that, as of date hereof and as of the Closing, except as may be explicitly set forth to the contrary elsewhere herein:

(a) Seller is a New York Corporation that had originally been duly formed but which may have been previously dissolved by proclamation; in which case, Seller shall be reinstated as a validly existing corporation in good standing under the laws of the State of New York, prior to Closing.

(b) The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby does not (i) violate or conflict with the Certificate of Incorporation of Seller, (ii) violate or conflict with any judgment, decree or order of any court applicable to or affecting Seller, (iii) breach the provisions of, or constitute a default under, any contract, agreement, instrument or obligation to which Seller is a party or by which Seller is bound, or (iv) violate or conflict with any law or governmental regulation applicable to Seller.

(c) Seller is the sole owner of the Shares and Leases with the full right, power and authority to sell and transfer same; and Seller has not contracted with any person, firm or other entity other than Purchaser to sell or otherwise transfer or dispose of the Shares and the Leases or any interest therein;

(d) All of the Shares owned by the Seller were duly issued, fully paid for and non-assessable (as those terms are understood under applicable provisions of the New York Business Corporation Law) or in the alternative, will be at Closing;

(e) The Leases are in full force and effect and Seller has no knowledge of any pending or threatened notice of any event of default;

(f) The maintenance charges and any assessment and parking charges, if any, payable in regard to the Apartments as of the date hereof are as set forth on **Exhibit C** and shall be paid up through the date of Closing;

(g) As of the date hereof, Seller has not received any written notice and has no actual knowledge of any intended assessment or increase in maintenance charges or in parking charges not reflected in the amounts set forth on **Exhibit C**;

(h) All Occupancy Leases (i) have been entered into in the ordinary course of business; and (ii) represent the entire agreement between Seller, as landlord, and the Tenant of the Apartment covered by each respective lease;

(i) The rents and security deposits and parking charges, if any, under the Occupancy Leases, as set forth on **Exhibit B**, are accurate as of the date hereof;

(j) As of the date hereof, there are no current rent or parking charge arrears or prepaid rents or parking charges in excess of thirty (30) days by any Tenant except as set forth on **Exhibit B** and there are no pending landlord-tenant proceedings except as shown on **Exhibit B** and Seller is aware of no facts that would justify any Tenant to withhold rent and the only Apartments subject to the Rent Laws are indicated as such on **Exhibit B**;

(k) As of the date of Closing, Seller shall be current with respect to all amounts due and owing the Corporation with respect to the Shares and the Leases and not otherwise in default under the Leases;

4

(l)    Seller is not and shall not at Closing be, indebted for labor or materials that might result in the filing of a mechanic's lien with respect to the Apartments;

(m)    At Closing there are and shall be no liens, judgments or tax liens against Seller or the Shares (other than the Corporation's general lien for maintenance, none of which shall be outstanding);

(n)    As of the date hereof, Seller has not received notice of any fire or other casualty affecting the Apartments;

(o)    As of the date hereof, Seller has not received notice of any non-working appliances in the Apartments;

(p)    The Shares and Leases shall be at Closing free and clear of all liens, encumbrances and adverse interests (collectively, "**Liens**") (other than Corporation's general lien for maintenance, but in any event and as noted above, all sums due and payable to Corporation shall be paid as of the Closing) or Seller shall deliver to Purchaser at Closing all requisite terminations, releases and/or satisfactions executed in a form suitable for filing/recording as may be necessary to remove the Liens of record to the extent they are the responsibility of Seller to remove;

(q)    Neither Seller nor any Person affiliated with Seller is in violation of any Anti-Terrorism Law (as defined below) or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law. Neither Seller nor any Person affiliated with Seller is any of the following (each a "**Blocked Person**"): (i) a Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224; (ii) a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224; (iii) a Person or entity with which Purchaser is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law; (iv) a Person or entity that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224; (v) a Person or entity that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control ("**OFAC**") at its official website or any replacement website or other replacement official publication of such list, or (vi) a Person or entity who is affiliated or associated with a person or entity listed above. Neither Seller nor any Person affiliated with Seller (A) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (B) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224. Neither Seller nor any Person affiliated with Seller shall (A) conduct any business or engage in any transaction or dealing with any Blocked Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person, (B) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224; or (C) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224, the USA Patriot Act or any other Anti-Terrorism Law. As used herein, "Anti-

Terrorism Laws" means any Applicable Laws relating to terrorism or money laundering, including Executive Order No. 13224, the USA Patriot Act, the laws comprising or implementing the Bank Secrecy Act, and the laws administered by OFAC (as any of the foregoing laws may from time to time be amended, renewed, extended, or replaced). As used herein, "**Person**" shall mean any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, institution, public benefit corporation, joint venture, entity or government (whether federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof);

(r)  Between the date hereof and the date of Closing, Seller shall not enter into any agreement or Occupancy Lease (other than a renewal lease, but only as may be required by law) affecting the use and/or occupancy of the Apartments, which would be binding or would adversely affect Purchaser;

(s)  There are no pending challenges or claims by any Tenant at the New York State Division of Housing and Community Renewal ("**DHCR**"), and no outstanding orders that have not been fully paid and or complied with;

(t)  At Closing, other than the Leases, Seller shall have no agreements or obligations to the Corporation or its shareholders, managing agent, transfer agent or attorneys that will not be terminated and discharged in full; and

(u)  All contributions to the Corporation's reserve fund and/or working capital fund will have been paid in full by Closing.

The provisions of this Paragraph 6 shall be deemed restated and re-represented as being true as of the Closing Date, but shall not survive the Closing.

7.  Purchaser's Representations. Purchaser represents, warrants and covenants that, as of the date hereof and the Closing, that Purchaser, and/or its assignee to be formed for the purpose of completing Purchaser's obligations hereunder:

(a)  Purchaser is a limited liability company that has been duly formed, validly existing and is in good standing under the laws of the State of New York. Purchaser is authorized to do business in the State of New York, and is in good standing under the laws of the State of New York;

(b)  This Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of Purchaser, and this Agreement constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms;

(c)  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby do not and/or will not (i) violate or conflict with the certificate of formation, or operating agreement of Purchaser, (ii) violate or conflict with any judgment, decree or order of any court applicable to or affecting Purchaser, (iii) breach the provisions of, or constitute a default under, any contract, agreement, instrument or obligation to

which Purchaser is a party or by which Purchaser is bound, or (iv) violate or conflict with any law or governmental regulation or permit applicable to Purchaser;.

(d)    Purchaser has received the Plan at least three (3) full business days prior to signing this Agreement;

(e)    Intentionally omitted;

(f)    Purchaser has and/or will have as of Closing, sufficient financial and other resources to purchase the Shares and Leases without obtaining financing;

(g)    Purchaser shall pay the maintenance charges and any special assessments payable under the Leases from and after the Closing Date;

(h)    Purchaser has no material judgments, warrants, or Federal Tax Liens filed against Purchaser or its assignee;

(i)    No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under Federal or State bankruptcy laws is pending against or contemplated by Purchaser;

(j)    Purchaser is not an employee benefit plan or a governmental plan or a party in interest of either such a plan, and that the funds being used to acquire the Property are not plan assets or subject to state laws regulating investments of and fiduciary obligations with respect to a governmental plan. As used herein, the terms "employee benefit plan," "party in interest," "plan assets" and "governmental plan" shall have the respective meanings assigned to such terms in ERISA, and the term "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated in connection therewith; and

The provisions of this Paragraph 7 shall be deemed restated and re-represented as being true as of the Closing Date but shall not survive the Closing.

8.    No Other Representations. All representations, understandings and agreements had between the parties with respect to the subject matter of this Agreement are merged into this Agreement which alone fully and completely expresses their agreement. Purchaser has inspected or waived inspection of the Occupancy Leases and Tenant files, minutes of the Corporation, the Leases, stock certificates and other Corporate documents it deems appropriate to review, and has completed all due diligence it requires. It has also examined or waived examination of the Premises, the Apartments (to the extent any are vacant), the fixtures, appliances, equipment and the Personal Property, if any, included in the sale (to the extent any are vacant), and knows the condition thereof. Purchaser acknowledges having entered into this Agreement without having relied upon any promises, statements, estimates, representations, conditions or other inducements, express or implied, oral or written, not set forth herein.

9.    Consent of Corporation. As noted above, this sale is subject to the approval of the Bankruptcy Court which approval order will include a provision declaring that the purchase of the Shares and Leases by Purchaser shall include the rights of a holder of unsold shares as provided by the Leases and the Corporation's By-Laws. Consent of the Corporation or it

7

Managing Agent is not required.

10.    Assumption by Purchaser.  Subject to compliance with all the requirements and conditions of this Agreement, Seller agrees to transfer and assign to Purchaser Seller's interest as lessee in the Leases, the Shares and the Personal Property, as provided in this Agreement, and as lessor under the Occupancy Leases, and Purchaser agrees to pay the Purchase Price and, from and after the Closing, to assume all of the terms, covenants and conditions of the Leases on the part of the lessee, and of the Occupancy Leases, on the part of the landlord thereunder, to be performed, all only to extent same first accrue and arise from and after the Closing, including, without limitation, the payment of all maintenance and assessment charges payable under the Leases first commencing the month after the Closing occurs. Purchaser shall deliver to the Corporation its signed agreement whereby Purchaser agrees to assume the Landlord's obligations contained in the Leases, first accruing and arising, from and after the Closing Date, if so required by the Corporation.

11.    Risk of Loss.

(a)    The risk of any loss or damage to the Apartments, or to the property included in this sale by fire or other cause, until the time of Closing, is assumed by Seller, but without any obligation on the part of Seller, except at Seller's option, to repair or replace any material loss or damage. Seller shall notify Purchaser of the occurrence of any material casualty within five (5) business days after the happening thereof. In the event of a material loss, should Seller not elect to repair or replace said material loss, Purchaser may elect to cancel this Agreement. Upon such election by Purchaser, Purchaser shall receive a refund of the sums paid on account of the Purchase Price. Such election shall be exercised by written notice to Seller within thirty (30) days of the date of Seller's notice of said material loss. For the purposes of this Paragraph 9, "material" shall mean any substantial loss or damage to two or more of the Apartments being sold hereunder reasonably estimated to cost in excess of $50,000 to repair.

(b)    If Purchaser does not elect to cancel, Purchaser shall complete the purchase in accordance with this Agreement without reduction in the Purchase Price except for the account of the deductible under Seller's insurance policy. At Closing, Seller shall turn over to Purchaser the proceeds (after actual third party expenses of collection actually paid) actually collected by Seller from the insurance carried by Seller to the extent that they are attributable to loss of or damage to any property included in this sale; if Seller has not received such proceeds, Seller shall assign Seller's right to any payment or additional payments from the Corporation and its own insurer which are attributable to the loss of or damage to any property included in this sale, less any sums theretofore expended by Seller to third parties to secure the Apartments subject to the casualty.

(c)    If the Purchaser shall fail to send written notice to Seller exercising Purchaser's option to cancel set forth above in a timely fashion, then it will be conclusively presumed that Purchaser has elected its option to cancel. Notwithstanding the provisions of this Paragraph 11 to the contrary, Seller shall be entitled to retain from any net insurance proceeds collected any sums theretofore expended by Seller to secure the Apartment(s) in connection with the loss or damage.

8

(d)    In the event of a lesser casualty, at Closing, Purchaser shall receive a credit equal to the lesser of (a) the reasonable cost of repairing the damage sustained, or (b) any net insurance proceeds collected by Seller with respect to such loss or damage.

12.    Closing. The closing of the transactions contemplated hereby (the "**Closing**") shall take place in accordance with the provisions of this Contract, on or about ten (10) business days of receiving written notice of Bankruptcy Court approval of this Contract and the docketing of a final, unappealable order including, inter alia, the provisions set forth in paragraph 3 above, at 11:00 AM, at the offices of the Corporation's attorney or Managing Agent or as otherwise designated by the Corporation, and if there is no such designation, at the offices of Turek Roth Grossman LLP, 377 Fifth Avenue, 6th Floor, New York, New York 10016. The time and date of the Closing are herein referred to as the "**Closing Date**."

13.    FIRPTA. The Parties shall comply with Internal Revenue Code Sections 897, 1445 and related provisions, as amended, and any substitute provisions of any successor statute and the regulations thereunder ("**FIRPTA**"). Prior to or at Closing, Seller shall furnish to Purchaser a Certification of Non-Foreign Status in accordance with FIRPTA.

14.    Seller's Closing Deliveries. At the Closing, Seller shall deliver or cause to be delivered to Purchaser the following documents duly executed and, where applicable, acknowledged, and the following other items (the documents and other items described in this Section 14 being collectively referred to herein as the "**Seller's Closing Documents**"):

(i)    Seller's certificates for the Shares allocated to the Apartments, duly endorsed for transfer to Purchaser or accompanied by a separate duly executed stock power to Purchaser, together with a new certificate for each Apartment issued in Purchaser's name;

(ii)    Seller's duplicate originals of the existing Leases and duly executed assignments thereof in favor of the Purchaser in the form required by the Corporation, together with a new Lease for each Apartment issued in Purchaser's name;

(iii)    New York City Department of Finance Real Property Transfer Tax Return (NYC RPT), including the New York State Combined Real Estate Transfer Tax Return and Credit Line Mortgage Certificate, and Certification of Exemption from the Payment of Estimated Personal Income Tax (Form TP-584), each duly executed (and notarized, where applicable) and if required, the New York State Real Property Transfer Report (RP-5217) for the Apartments (collectively, the "**Transfer Tax Returns**");

(iv)    an Assignment and Assumption of Leases and Security Deposits regarding the Occupancy Leases and all security deposits held thereunder, along with an indemnification from Seller with respect to any claims made by Tenants under the Occupancy Leases relating to the period of time prior to the Closing (but after the date of Seller's acquisition of the subject Apartment) in the form annexed hereto as Exhibit D;

(v)    All files pertaining to the Apartments and the Occupancy Leases, including, without limitation, all DHCR filings, and all correspondence;

(vi)    A certificate confirming that Seller is a U.S. Taxpayer as required under

Section 1445 of the Internal Revenue Code;

(vii)    A copy of the updated rent roll setting forth the rents in effect and the security deposits under the Occupancy Leases held as of the date of Closing;

(viii)    Join with Purchaser in the execution of the notice to tenants under Occupancy Leases, in the form of Exhibit E hereof;

(ix)    Keys to the Building, Apartments and mailboxes, to the extent available;

(x)    Such other instruments and documents, in form and substance reasonably satisfactory to Seller and Purchaser, as may be required under this Agreement or by the Corporation, to effect the Closing, except as set forth in this Agreement;

(xi)    a letter executed by the Corporation stating that Seller is current on all amounts due the Corporation in connection with the Shares and Leases through the end of the month in which Closing occurs, or if payments have not been made for the month of Closing, acknowledgement of receipt of any required payments at Closing, or in the absence thereof, an order (or provision in an order) from Bankruptcy Court declaring that upon the Closing, the Shares are being transferred to Purchaser free and clear of any sums and obligations claimed due and payable to the Corporation, its managing agent, transfer agent and attorneys, up to the date of Closing, including but not limited to the agreement first set forth in the 7th amendment to the Plan;

(xii)    Signed resignations of any director of the Corporation designated or nominated by Seller;

(xiii)    Intentionally omitted;

(xiv)    Occupancy Lease files with original leases to the extent in Seller's possession, or true copies of same if originals are not available, and all renewals of same, and any painting records, to the extent in Seller's possession;

(xv)    Intentionally omitted..

(xvi)    A letter designating Purchaser a Holder of Unsold Shares as to each of the Apartments, executed by Seller as Successor Sponsor;

(xvii)    A certificate of Seller indicating that the all of representations and warranties of Seller set forth in this Agreement are true and correct as of the Closing Date;

(xviii)    The written consent or resolution of Seller authorizing the execution and delivery of this Agreement and the transactions contemplated herein; and

(xviv)    Such other instruments and documents, in form and substance reasonably satisfactory to Seller and Purchaser, as may be reasonably necessary to effect the Closing

15.    Purchaser's Closing Documents; At the Closing, Purchaser shall deliver to Seller

the following documents duly executed, and where applicable, acknowledged by Purchaser (the documents described in this Section 13 being collectively referred to herein as the **"Purchaser's Closing Documents"**):

      i.     Execute and deliver to Seller and the Corporation an agreement assuming the Lease and obligations thereunder which first accrue and arise from and after the Closing Date, in the form required by the Corporation;

      ii.    Execute and deliver counterparts of a new proprietary lease substantially the same as the Proprietary Lease, for the balance of the Lease term, in which case the Lease shall be canceled and surrendered to the Corporation together with Seller's assignment thereof to Purchaser;

      iii.   The Transfer Tax Returns;

      iv.   Executed Assignment and Assumption of Leases and Security Deposits (in substantially the form annexed hereto as **Exhibit E**) regarding the Occupancy Leases and all security deposits held thereunder, along with an indemnification from Purchaser with respect to any claims made by tenants under the Occupancy Leases relating to the period of time after the Closing;

      v.    Executed countersigned notice to the tenants under the Occupancy Leases;

      vi.   A certificate of Purchaser indicating that the all of representations and warranties of Purchaser set forth in this Agreement are true and correct as of the Closing Date;

      vii.  The written consent or resolution of Purchaser authorizing the execution and delivery of this Agreement and the transactions contemplated herein; and

      viii.  Such other instruments and documents, in form and substance reasonably satisfactory to Seller and Purchaser, as may be reasonably necessary to effect the Closing.

    16.    Transfer Taxes and Processing Fees. Sums Owed to the Corporation.

    (a)    Seller shall prepare, and at Closing: (i) execute and deliver the Transfer Tax Returns and ACRIS form(s) and (ii) pay any and all taxes due thereunder, if any[1]. The Transfer Tax Returns together with the check representing payment of the Transfer Tax shall be forwarded to the tax authorities by Purchaser's attorney following Closing. Seller may, at its option, upon two (2) business days advance written notice, request Purchaser to deliver such checks in partial payment of the Purchase Price. Purchaser shall execute such returns as required. Purchaser shall be responsible for recording the ACRIS form(s).

    (b)    Pursuant to the Plan, the conveyance of the Shares and the Leases as contemplated herein shall be completed without any fees or expenses imposed including, without limitation, any fees or expenses payable to the Corporation, its managing agent or its attorneys.

---

[1] Seller shall seek to obtain an order from the Bankruptcy Court excepting this transaction from the payment of any state and/or city recording fees and/or transfer taxes.

In the event that any fees or charges must be paid to the Corporation, its managing agent, transfer agent or attorneys, to have the Closing proceed as provided for herein, same shall be paid by Seller.

(c)    At Closing, Seller shall make full payment to the Corporation at Closing of any and all outstanding contributions to the Corporation's Reserve fund and/or working capital Fund as provided in the Seventh Amendment to the Plan (paragraph 13). This provision shall survive Closing.

17.    Apportionments.

(a)    The parties shall, at Closing, apportion as of midnight of the day preceding the date of actual Closing; (i) the maintenance under the Leases and other charges, including, but not limited to, parking charges and special assessments presently in effect, if any, due the Corporation; (ii) rents paid by the tenants of the Apartments pursuant to the Occupancy Leases for the month of Closing; and (iii) Senior Citizen Rent Increase Exemption and Tax Abatements, if any to the extent the Corporation has credited same to Purchaser against its future maintenance obligations. Purchaser shall be solely responsible to pay any installments of special assessments which are or may become payable subsequent to Closing and Seller shall at Closing pay, and shall remain solely responsible to pay, any installment of special assessments which are due prior to Closing. Notwithstanding the foregoing, any assessment made by the Corporation after the Closing to recoup the Coop/Condo Tax Abatement shall be prorated with Seller responsible for the amount thereof up to the Closing Date, and to the extent the Corporation has previously imposed such an assessment, the estimated amount that would be assessed against the Apartments shall be pro-rated at Closing, and re-adjusted if necessary, after Closing.

(b)    With respect to any occupant's rent arrears, to the extent that Purchaser receives rents or additional rents under the Occupancy Leases (including monthly payments of any **"pass-throughs"**) after the Closing from a tenant who was in arrears at Closing, the amount of such rents or additional rents shall be paid to Seller or retained by Purchaser, as applicable in the following order of priority: (i) first, to amounts due for the month of the Closing, to be apportioned between Seller and Purchaser as if received prior to Closing; (ii) second, to amounts due Purchaser for any period after the Closing, and(iii) third, provided Purchaser is current in its rent collections, to Seller for periods prior to the month in which the Closing occurred, less the cost of collection. Seller shall be entitled to collect any arrearages from the Tenant after the Closing. Any rents or additional rents received by Seller after the Closing shall be deemed to be held by Seller in trust for Purchaser's account to the extent owed Purchaser and Seller shall remit any such amounts to Purchaser within five (5) Business Days after receipt thereof.

(c)    At Closing, Seller shall give Purchaser a credit against the Purchase Price in the amount of the security deposits as set forth on **Exhibit B** for those tenants remaining in possession at Closing including interest thereon, if any, being held by Seller with respect to the Occupancy Leases. No security deposits as set forth in **Exhibit B** shall be applied to past due rents from such Tenant unless the Tenant is no longer in possession. To the fullest extent permitted by law and to the extent that Purchaser receives the security deposits, Purchaser shall indemnify and hold harmless Seller from and against any loss, costs and damages resulting from any mishandling or misapplication made with respect to such security deposits after Closing. To

the extent that Seller does not deliver a security deposit or a credit for a security deposit, Seller shall indemnify, and hold harmless Purchaser from and against any loss, costs and damages resulting from any mishandling or misapplication made with respect to such security deposits prior to Closing or any failure to transfer the security deposit to Purchaser at Closing. These indemnifications shall survive Closing.

(d)    All rent stabilization fees for the period of Seller's ownership shall be pro-rated at Closing.

18.    Cancellation of the Leases. If prior to Closing, the Corporation shall elect to cancel and terminate the Leases under any option or privilege reserved therein for any reason except Seller's default, this Agreement at Purchaser's option shall thereupon become a nullity and Seller shall be deemed to be unable to convey the Shares and the Leases and Seller shall refund to Purchaser the Contract Deposit paid on account of the purchase price, with interest thereon, if any, in addition to Purchaser's actual and reasonable out-of-pocket expenses for a lien and judgment search. If Purchaser elects to close on the shares alone, the Closing shall proceed as revised by such condition.

19.    Broker. The parties each agrees that no broker other than **Mark Zborovsky LLC** (the "**Broker**") brought about this transaction and the parties each represents that they had no dealings with any other broker concerning this transaction. At Closing, Seller shall pay the Broker a commission pursuant to a separate agreement. Purchaser and Seller shall defend, indemnify and hold each other, as the case may be, harmless from and against any and all claims and damages incurred as a result of the breach of the foregoing representation by the other party. This Paragraph shall survive Closing.

20.    Default; Liquidated Damages. If Purchaser defaults hereunder, Seller's sole remedy shall be to retain the Contract Deposit together with interest accrued thereon, if any, as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be impossible to ascertain and that the Contract Deposit constitutes a fair and reasonable amount of damages under the circumstances. If Seller defaults hereunder, Purchaser's remedy shall be to either (i) terminate the transaction by Notice to Seller, upon which termination, the Contract Deposit shall be promptly refunded to Purchaser or as Purchaser directs, or (ii) commence an action for specific performance. **Time shall be of the essence** for failure to cure a default within thirty (30) days (or otherwise commence and proceed in good faith to cure if such cure reasonably takes longer than such 30 day period) following the giving of a notice of cancellation identifying the default.

21.    Amendments to Plan. Not more than thirty (30) days after Closing, Purchaser shall submit for filing to the Attorney General's office an amendment to the Plan as a holder of unsold shares stating, inter alia, substantially the following:

"Pursuant to a Contract of Sale dated [insert date of contract] which Contract of Sale was approved by order of the United States Bankruptcy Court for the Southern District of New York in the matter titled *In re: Oxford Associates Group, Inc.* (Case No. 17-12487 (MKV), on or about [insert scheduled closing date] _____ purchased shares allocated to apartments from Oxford Associates Group, Inc. ("Seller"). In conjunction with such sale and as

13

provided in the Bankruptcy Court's Order approving the sale, _____ has been recognized to be a Holder of Unsold Shares as provided in the Apartment Corporation's Proprietary Lease and By-laws. Upon closing of the sale to _____, Seller no longer has any rights to the cooperative interests sold." In addition, Purchaser may also include such disclaimers or similar disclaimers disavowing any obligation to fulfill any promise or other obligation of the Sponsor or any prior Holder of Unsold Shares, as such obligations may have appeared from time to time in the amendments previously filed by Seller.

Purchaser shall take all steps necessary to file and distribute this amendment. Purchaser shall submit a draft of this amendment or any other amendment Purchaser intends to submit before Closing to Seller prior to filing. Purchaser may not enter into purchase agreements to sell any of the Apartments under the Plan until after Closing. This Paragraph 21 shall survive the Closing hereunder.

22.     Miscellaneous.

(a)     The term "Purchaser" should be read as "Purchasers" if more than one person is purchasing the Apartments, in which case their obligations shall be deemed joint and several.

(b)     The use of the masculine gender shall be deemed to refer to the feminine or neuter gender and the use of the singular shall be deemed to refer to the plural and vice versa, whenever the context so requires.

(c)     The acceptance of the Shares and the assumption of the Leases by the Purchaser shall be deemed to be a full performance and discharge of every agreement and obligation on the part of the Seller to be performed pursuant to the provisions of this Agreement except those specifically provided to survive Closing.

(d)     This Agreement cannot be changed, discharged or terminated orally.

(e)     This Agreement shall be governed by the laws of the State of New York.

(f)     The parties hereto agree to execute the lead paint disclosure form annexed hereto as **Exhibit F**.

23.     Escrow. The Contract Deposit shall be held by Escrow Agent and disposed of only in accordance with the following:

(a)     At the Closing, Escrow Agent shall promptly deliver the Contract Deposit to Seller or disburse same at Seller's direction.

(b)     On receipt by Escrow Agent of a notice executed by one of the parties hereto (Purchaser, Seller or their permitted successors or assigns) stating (i) that the other party has defaulted in the performance of its obligations hereunder (or acknowledging its own default) or (ii) on or after the Closing Date, as the same may be adjourned in accordance with the terms hereof that the title to the Shares and Leases has not closed under this Agreement because of (A) a default by the other party, (B) Seller's inability to convey title to the Shares

14

and Leases in accordance with the provisions of this Agreement or (C) the inability of a party to satisfy one or more of the conditions to Closing set forth in this Agreement, Escrow Agent shall, within three (3) Business Days, deliver a copy of said notice to the other party and deliver the Contract Deposit to the party entitled thereto on the thirteenth (13th) Business Day after receipt by Escrow Agent of said notice unless Escrow Agent, prior to such return, receives from the other party a statement demanding retention of said Contract Deposit by Escrow Agent. On receipt of such a statement demanding retention, Escrow Agent shall then release the Contract Deposit only on receipt of a statement executed by both parties directing the release of the Contract Deposit or as Escrow Agent may be directed by a court of competent jurisdiction after final appeal.

(c)    Escrow Agent shall also release the Contract Deposit on receipt of a statement executed by one party directing payment of the Contract Deposit to the other party.

(d)    Notwithstanding anything herein to the contrary, in the event of any disagreement or the presentation of adverse claims or demands in connection with the Contract Deposit or any other item affected hereby, Escrow Agent shall refuse to comply with any such claims or demands during the continuance of such disagreement and shall retain the Contract Deposit until final resolution thereof but may file a suit in interpleader in any court of competent jurisdiction in the State of New York, New York County, or at its option may deposit the Contract Deposit with a court of competent jurisdiction, whereupon Escrow Agent shall be released from any further obligation or claim with respect thereto.

(e)    Upon delivery of the Contract Deposit to either party or a court of competent jurisdiction under and pursuant to the provisions of this Section 21, Escrow Agent shall be relieved of all liability, responsibility or obligation with respect to, or arising out of, the Contract Deposit and any and all of its obligations arising therefrom.

(f)    Escrow Agent assumes no responsibility except for the investment and disbursement of the Contract Deposit, all as provided herein, and shall not be liable for any error in judgment or any action or inaction taken by it in accordance with the terms of this Agreement except for Escrow Agent's negligence or willful misconduct.

(g)    Escrow Agent may consult with its counsel and shall not be held liable for any action taken or omitted in good faith on advice of such counsel.

(h)    Except for Escrow Agent's willful misconduct or negligence, Seller and Purchaser specifically waive any and all claims, rights, demands, and causes of action against Escrow Agent arising from any good faith disposition of the Contract Deposit made pursuant to this Agreement, and, except in the case of Escrow Agent's negligence or willful misconduct, shall look only to each other for any damages or claims arising or growing out of the disposition thereof. To the fullest extent permitted by law, the parties jointly agree to defend, indemnify and hold Escrow Agent harmless from and against any costs, claims, expenses and damages incurred in connection with or arising out of this Agreement or the performance or non-performance of Escrow Agent's duties under this Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or willful disregard of this Agreement. This indemnity includes, without limitation, disbursements and

attorneys' fees either paid to retain attorneys or representing the hourly billing rate with respect to legal services rendered by Escrow Agent to itself.

(i)     Escrow Agent shall be protected in acting or in refraining from acting upon any written notice, request, waiver, consent, certificate, receipt, authorization, power of attorney, or other paper or document which Escrow Agent reasonably believes to be genuine.

(j)     The Contract Deposit will be held in an IOLA account at JP Morgan Chase Bank, 349 Fifth Avenue, New York, NY.

(k)     Escrow Agent shall be entitled to represent Seller in any matters, including, but not limited to, matters in connection with any litigation arising out of this Agreement. The parties hereto waive any actual or possible conflict of interest between Escrow Agent's duties and obligations with respect to its holding of the Contract Deposit and its duties and obligations as attorney for Seller.

(l)     Escrow Agent shall not have any liability or obligation for loss of all or any portion of the Contract Deposit by reason of (x) the insolvency or failure of the institute or depository with whom the escrow account is maintained, or (y) any taxing authority levy required by virtue of the provision by Seller of its taxpayer identification number in connection with the opening of such escrow account. The provisions of this Paragraph 20 shall survive the Closing or termination of this Agreement.

24.     Occupancy. Purchaser acknowledges that the Apartments are leased to and are occupied by individuals and Purchaser has agreed to acquire the Apartments subject to such tenancies. In connection therewith the Purchaser agrees to the following:

(a)     If a tenant in occupancy does not voluntarily remove from an Apartment when his or her lease expires or his or her tenancy is terminated, or if his or her right to occupancy ends, Purchaser shall be required to obtain occupancy at its own expense.

(b)     Some if not all of the Apartments are subject to a form of rent regulation as well as Section 352-eee of the General Business Law (collectively, the "Rent Laws"). Those Apartments subject to the Rent Laws are indicated as such on **Exhibit B**.

(c)     Seller shall assign and Purchaser shall assume from and after the Closing all Seller's right, title and interest, as landlord, in and to the Occupancy Leases and tenancies for the Apartments, which will include the obligation to repair and maintain the Apartments for the benefit of the existing tenants, the right to collect rent (including arrears, subject to the provisions of Section 17(b) hereof) payable under the existing leases or tenancies, whether the same shall be greater or less than the proprietary rent established by the Leases, and the obligation to hold the existing tenant's security deposits pursuant to the applicable Rent Laws.

25.     Inability to Convey. Notwithstanding any contrary provisions of this Agreement, express or implied, or any contrary rule of law or custom, if Seller, in good faith, shall be unable to transfer the Shares and the Leases in accordance with this Agreement for any reason not arising out of Seller's acts or omissions, then the sole obligation of Seller shall be to

refund to Purchaser the Contract Deposit. (If Seller's inability to transfer the Shares and Leases does not prevent a transfer which is not in accordance with its obligations under this Agreement, Purchaser may waive such inability to convey in accordance with this Agreement and proceed to Close in accordance with its obligations under this Agreement.) Upon making such refund, this Contract shall be canceled and neither party shall have any further claim against the other hereunder. Purchaser shall only be obligated to close if Seller is able to transfer at Closing the Shares and Leases free and clear of all obligations, liens, security interests and encumbrances that specifically relate to Seller and Seller's own actions or omissions with respect to the Apartments (except the general lien of the Corporation for maintenance, none of which will be outstanding at Closing) and in accordance with the other terms of this Agreement. In the event any other obligations, liens, security interests or encumbrances have not been removed at Closing, Seller shall have the right, but not the obligation, to remove such obligations, liens, security interests or encumbrances and shall be entitled to a reasonable adjournment to effect such removal. Seller shall not be required to spend any amount in excess of $100,000 to remove any obligation, lien, security interest or encumbrance with respect to an Apartment, other than consensual obligations (including but not limited to the agreement with the Corporation initially disclosed in the 7th Amendment to the Plan), liens and encumbrances and all payments due the Corporation, its managing agent, transfer agent, and attorneys, to and including the Closing Date, which Seller must satisfy. If Seller elects not to effect such removal, Purchaser shall either complete the purchase in accordance with this Agreement without any reduction in price if it is permitted by the Corporation to do so, or cancel this Agreement, in which case the Contract Deposit shall be refunded to Purchaser and neither party shall have any further obligation hereunder.

26.    Inspections. Seller shall give Purchaser or Purchaser's agent or representative, access to Seller's records regarding the Apartments at the offices of the Seller's managing agent, including all files pertaining to the Occupancy Leases, at reasonable times upon reasonable notice. Purchaser shall have the right to inspect the Apartments, subject to the rights of the tenants who occupy the Apartments.

27.    Notices. All notices or demands ("**Notice**") that must or may be given or made hereunder shall be in writing and sent either by receipted hand delivery, reputable overnight courier or by certified or registered mail, return receipt requested, postage prepaid, to each of the parties as follows:

If to Seller:

Oxford Associates Group, Inc.
5 West 37th Street
New York, New York 10016

with a courtesy copy to:

Turek Roth Grossman LLP
377 Fifth Avenue, 6th Floor
New York, New York 10016
Attn: Allen M. Turek, Esq.
Email: aturek@tureklaw.com

17

If to Purchaser:

Benedict Realty Group, LLC
150 Great Neck Road, Suite 402
Great Neck, New York 11021

with a courtesy copy to:

Sonnenschein, Sherman & Deutsch, LLP
7 Penn Plaza, Suite 900
New York, NY 10001
Attn: Sander Srulowitz, Esq.
Email: ssrulowitz@ssdllp.com

or to such other address for such party as said party shall hereafter designate by Notice given to the other party pursuant to this Paragraph. Notices may be given by and to a party's attorney and attorneys may change the dates referred to herein by a signed writing. Notices shall be deemed given upon receipt when sent by hand delivery, on the following business day when sent by overnight courier and on the third business day after the notice is postmarked, if sent by certified mail.

28.    Vacancies. With respect to any Apartments that are vacant as of the date hereof and in the event that any of the Apartments become vacant between the date hereof and Closing, Seller shall not relet such Apartment. Provided Purchaser is not in default hereunder beyond any applicable cure period following a notice to cure, Seller shall take no steps to enter into contracts for the sale of any of the Shares and appurtenant Leases following the execution of this Agreement. As of the date hereof, and further to paragraph 1B above, Seller represents it is not in contract to sell any of the Apartments to any other purchaser.

29.    Assignment. This Agreement may not be assigned by Purchaser except that Purchaser may assign this Agreement and the Contract Deposit made hereunder to an entity which Purchaser controls, with Purchaser providing written notice of such assignment within five (5) business days of the assignment.

30.    Errors and Omissions. The computations of adjustments and apportionments shall survive the Closing for six (6) months to allow subsequent corrections of errors and omissions which may occur and to account for future adjustment of items required to be adjusted at Closing but which amounts were not reasonably ascertainable at that time.

31.    Counterparts. This Agreement may be executed in counterparts, all of which when taken together shall constitute one Agreement.

18

32.    Execution. This Agreement shall not be considered an offer or an acceptance of an offer by Seller, and shall not be binding upon Seller, until executed and delivered by Seller and Purchaser. Facsimile or other electronic signatures shall be deemed the equivalent of originals in all respects.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement the day and year first above written.

SELLER:

OXFORD ASSOCIATES GROUP, INC.

By: _____
Name: George Kyriak
Title:    President

PURCHASER:

BENEDICT REALTY GROUP, LLC

By: _____
Name:
Title:

WITH RESPECT TO TERMS OF ESCROW ONLY:

TUREK ROTH GROSSMAN LLP

By: _____

## EXHIBIT A

LIST OF APARTMENTS AND NUMBER OF SHARES

## APARTMENTS HELD BY HOLDER OF UNSOLD SHARES

| 632 Warburton | | 650 Warburton | | 678 Warburton | |
|---|---|---|---|---|---|
| Apt. No. | Shares | Apt. No. | Shares | Apt. No. | Shares |
| 3B | 441 | 2E | 630 | 2E | 630 |
| 3C | 630 | 2F | 432 | 2J | 324 |
| 3D | 378 | 2J | 324 | 2L | 378 |
| 3F | 648 | 2K | 378 | 4F | 504 |
| 3J | 765 | 2L | 378 | 4H | 504 |
| 3L | 567 | 3E | 720 | 4J | 378 |
| 3M | 441 | 5D | 432 | 5D | 432 |
| 4C | 630 | | | 5G | 486 |
| 4E | 765 | 5I | 810 | 5I | 810 |
| 5A | 504 | 5M | 360 | 6A | 288 |
| 5K | 432 | 7E | 851 | 6D | 432 |
| 6K | 432 | 7J | 453 | 6F | 576 |
| 7A | 567 | 7K | 529 | 6H | 576 |
| 7B | 567 | | | 6I | 810 |
| 7C | 810 | | | 6L | 504 |
| 7D | 486 | | | 7D | 453 |
| 7E | 945 | | | 7E | 851 |
| 7F | 810 | | | 7H | 604 |
| 7H | 720 | | | | |
| 8A | 567 | | | | |

TOTAL # OF UNSOLD SHARES: 27,942

EXHIBIT A

EXHIBIT B

SCHEDULE OF OCCUPANCY LEASES, RENTS, ARREARS,
PREPAID RENT AND SECURITY DEPOSITS INCLUDING INTEREST,
INCLUDING RENT REGULATORY STATUS

WARBURTON-TENANT LIST

YEAR    1/1/2019

| 832 WARBURTON AVENUE | Apt # | LEASE EXP. | ARREARS/GO O | RENT BILLED | COLLECTED | BALANCE DUE |
|---|---|---|---|---|---|---|
| ROSA WEARING | 3B | 8/31/2018 | $ 1,450.00 | $ 1,450.00 | $ | $ 2,900.00 |
| MONICA HARMON | 3C | 10/31/2020 | $ | $ 1,348.76 | $ 1,348.76 | $ |
| JAQUELINE PENINGTON | 3D | 10/31/2019 | $ | $ 1,450.00 | $ 1,400.00 | $ 50.00 |
| ROSE TEABOUT *EXEMPT | 3F | 5/31/2020 | $ | $ 1,089.90 | $ 1,089.90 | $ |
| DONALD WILSON | 3J | 10/31/2018 | $ | $ 1,200.00 | $ 1,200.00 | $ |
| KARENA NICHOLAS -OREAGAN | 3L | 8/31/2019 | $ | $ 1,200.00 | $ | $ 1,200.00 |
| DANIEL LUGO RODRIGUEZ | 3M | 12/31/2019 | $ | $ 1,430.00 | $ | $ 1,430.00 |
| SELMA KWARTLER *EXEMPT | 4C | 6/30/2019 | $ | $ 657.88 | $ 657.88 | $ |
| vacant | | 12/31/2018 | | | $ | $ |
| EDWARD HENDERSON OVED IN 9/1 | 5A | 8/31/2019 | $ | $ 1,500.00 | $ | $ 1,500.00 |
| CANDACE HANASI | 5K | 1/30/2019 | $ 2,100.00 | $ 1,400.00 | $ | $ 3,500.00 |
| LENORA JOHNSON | 6K | 6/30/2018 | $ 7,160.00 | $ 1,300.00 | $ | $ 7,160.00 |
| DAVID CHRISTOPHER | 7A | 10/31/2018 | $ 50.00 | $ 1,450.00 | $ | $ 1,500.00 |
| William Green (New) | 7B | 5/31/2019 | $ | $ 1,400.00 | $ | $ 1,400.00 |
| P.MCCRAE&J.LORD *EXEMPT | 7C | 7/31/2018 | $ | $ 893.83 | $ | $ 893.83 |
| VICTOR GONZALES | 7D | 7/31/2018 | $ (1,230.00) | $ 1,230.00 | $ | $ |
| CHERYL SULLIVAN *EXEMPT | 7E | 5/31/2019 | $ | $ 918.23 | $ 918.23 | $ |
| ETELKA BATTA *EXCEMPT  rent | 7F | 5/31/2019 | $ | $ 519.10 | $ 519.10 | $ |
| NANCY STRINGHAM *EXEMPT $814 | 7H | 10/31/2020 | $ | $ 814.15 | $ | $ 814.15 |
| JASON WEST | 8A | 10/31/2019 | $ | $ 1,400.00 | $ | $ 1,400.00 |

| 650 Warburton | Apt # | LEASE EXP. | | RENT BILLED | | | | |
|---|---|---|---|---|---|---|---|---|
| ANGELINA MITCHELL  *EXEMPT | 2E | 01/31/201 | $    25.00 | $    749.95 | $ | 749.95 | $ | 25.00 |
| FRANK GRANT  *EXEMPT | 2F | 10/31/2019 | $ | $    799.95 | $ | | $ | 799.95 |
| ADELAIDE TELLEH | 2J | 9/31/2019 | $ | $  1,250.00 | $ | | $ | 1,250.00 |
| JOHN LARKIN  *EXEMPT | 2K | 2/28/2020 | $ | $    760.49 | $ | | $ | 760.49 |
| ARNOLD/SHARAE BELTON *EXEMPT | 2L | 8/31/2019 | $ | $    658.80 | $ | | $ | 658.80 |
| PATRICIA/ANDRE MASON *EXEMPT | 3E | 1/31/2020 | $ | $    947.54 | $ | 947.54 | $ | - |
| NICK CURANAJ | 5D | 7/31/2020 | $ | $  1,250.00 | $ | | $ | 1,250.00 |
| WILLIAM TISHELMAN  *EXEMPT | 5I | 5/31/2020 | $ | $    881.83 | $ | | $ | 881.83 |
| LAWRENCE TERRY | 5M | m-m | $ | $  1,000.00 | $ | 1,000.00 | $ | - |
| SAKINA ALLEN  *EXEMPT | 7E | 8/31/2019 | $ | $    892.27 | $ | | $ | 892.27 |
| ATCHON CACA | 7J | m-m | $ | $  1,350.00 | $ | | $ | 1,350.00 |
| DANIEL MELENDEZ (RENT INCR 8/1 | 7K | 7/31/2019 | $ | $  1,475.00 | $ | | $ | 1,475.00 |

| 678 Warburton | Apt # | LEASE EXP. | $ | RENT BILLED | $ | | $ | |
|---|---|---|---|---|---|---|---|---|
| LEVERN/MATTIE GAMBLE  *EXEMPT | 2E | 2/28/2020 | $ | $ 947.00 | $ | 947.00 | $ | |
| ALEXANDER ARTUSO | 2J | 1/0/1900 | $ 300.00 | $ 1,400.00 | $ | | $ | 1,700.00 |
| GAIL BAXTER  *EXEMPT | 2L | 2/28/2018 | $ 578.78 | $ 578.78 | $ | | $ | 1,157.56 |
| DIANE SCHRADER  *EXEMPT | 4F | 9/30/2018 | $ | $ 991.08 | $ | 991.08 | $ | |
| CAROL BOHAN  *EXEMPT(664.18) | 4H | 5/31/2019 | $ | $ 798.75 | $ | | $ | 798.75 |
| ERICA MUNGER/EI SHAMA MCNEAL | 4J | 5/31/2018 | $ | $ 1,100.00 | $ | | $ | 1,100.00 |
| Rosa Peguero | 5D | 6/1/2020 | $ 125.00 | $ 1,325.00 | $ | 1,325.00 | $ | 125.00 |
| JACK TOON | 5G | 5/31/2018 | $ | $ 1,200.00 | $ | 1,200.00 | $ | |
| BARARA CANTOR  *EXEMPT | 5I | 5/31/2018 | $ | $ 839.85 | $ | | $ | 839.85 |
| ARETA ANNMARIE REID | 6A | 10/31/2018 | $ 700.00 | $ 1,200.00 | $ | | $ | 1,200.00 |
| FELICIA SMITH | 6D | 10/31/2016 | $ | $ 1,550.00 | $ | | $ | 1,550.00 |
| ANNIE SMITH  *EXEMPT | 6F | 9/30/2019 | $ | $ 1,600.00 | $ | | $ | 1,600.00 |
| EUSEBRO CASTRO  *EXEMPT | 6H | 10/31/2018 | $ | $ 769.52 | $ | | $ | 769.52 |
| FRANCESCA LORENZ  *EXEMPT | 6I | 10/31/2019 | $ | $ 755.88 | $ | | $ | 755.88 |
| LOUIS DEFINO  *EXEMPT (669.10) | 6L | 5/31/2018 | $ | $ 578.88 | $ | | $ | 578.88 |
| STEVEN DICKER  *EXEMPT | 7D | 10/31/2018 | $ | $ 807.21 | $ | 807.21 | $ | |
| SOPHIA EWART | 7E | 2/28/2019 | $ 1,050.00 | $ 1,650.00 | $ | | $ | 1,700.00 |
| ALFONSO MARKU | 7H | 0/2018/9/30/2018 | $ | $ 1,200.00 | $ | 1,200.00 | $ | |
| | | | $ 12,938.78 | $ 53,731.15 | $ | 18,079.66 | $ | 48,590.27 |

## EXHIBIT C

MAINTENANCE CHARGES, ASSESSMENTS AND PARKING CHARGES
PAYABLE FOR EACH APARTMENT

Maintenance 678 —
REPORTS 650 —
632 —

Dec-18

| 632 | | Amount |
|---|---|---|
| 3B | $ 552.97 | $ 552.97 |
| 3C | $ 789.96 | $ 789.96 |
| 3D | $ 473.97 | $ 473.97 |
| 3F | $ 812.53 | $ 812.53 |
| 3J | $ 959.23 | $ 959.23 |
| 3L | $ 710.96 | $ 710.96 |
| 3M | $ 552.97 | $ 552.97 |
| 4C | $ 789.96 | $ 789.96 |
| 4E | $ 959.23 | $ 959.23 |
| 5A | $ 631.97 | $ 631.97 |
| 5K | $ 541.68 | $ 541.68 |
| 6K | $ 541.68 | $ 541.68 |
| 7A | $ 710.96 | $ 710.96 |
| 7B | $ 710.96 | $ 710.96 |
| 7C | $ 1,015.66 | $ 1,015.66 |
| 7D | $ 609.40 | $ 609.40 |
| 7E | $ 1,184.94 | $ 1,184.94 |
| 7F | $ 1,015.66 | $ 1,015.66 |
| 7H | $ 902.81 | $ 902.81 |
| 8A | $ 710.96 | $ 710.96 |
| 632 TOTAL | $ 15,178.46 | |

| 650 | Maintenance | |
|---|---|---|
| 2E | $ 789.96 | $ 789.96 |
| 2F | $ 541.68 | $ 541.68 |
| 2J | $ 406.26 | $ 406.26 |
| 2K | $ 473.97 | $ 473.97 |
| 2L | $ 473.97 | $ 473.97 |
| 3E | $ 902.81 | $ 902.81 |
| 5D | $ 541.68 | $ 541.68 |
| 5H | $ 722.25 | $ 722.25 |
| 5I | $ 1,015.66 | $ 1,015.66 |
| 5M | $ 451.40 | $ 451.40 |
| 7E | $ 1,067.07 | $ 1,067.07 |
| 7J | $ 568.02 | $ 568.02 |
| 7K | $ 663.31 | $ 663.31 |
| 650 TOTAL | $ 8,618.04 | |

| 678 | Maintenance | |
|---|---|---|
| 2E | $ 789.96 | $ 789.96 |
| 2J | $ 406.26 | $ 406.26 |
| 2L | $ 473.91 | $ 473.91 |
| 4F | $ 631.97 | $ 631.97 |
| 4H | $ 631.97 | $ 631.97 |
| 4J | $ 473.97 | $ 473.97 |
| 5D | $ 541.68 | $ 541.68 |
| 5G | $ 609.40 | $ 609.40 |
| 5I | $ 1,015.66 | $ 1,015.66 |
| 6A | $ 361.12 | $ 361.12 |
| 6D | $ 541.68 | $ 541.68 |
| 6F | $ 722.25 | $ 722.25 |
| 6H | $ 722.25 | $ 722.25 |
| 6I | $ 1,015.66 | $ 1,015.66 |
| 6L | $ 631.97 | $ 631.97 |
| 7D | $ 568.02 | $ 568.02 |
| 7E | $ 1,067.07 | $ 1,067.07 |
| 7H | $ 757.36 | $ 757.36 |
| 678 TOTAL | $ 11,962.16 | |
| PARKING | | |
| TOTAL | $ 35,758.66 | |

10/01/18  PARKING        0067-832-PK01

| Balance Forward: | ($10,735.01) | |
|---|---|---|
| 24 Updates @ $47.02 | $1,128.48 | |
| Total Transactions: | $1,128.48 | $0.00 |

WARBURTON TENANT LIST

| | | parking |
|---|---|---|
| ROSA WEARING | 3B | |
| MONICA HARMON | 3C | 1 |
| JAQUELINE PENINGTON | 3D | |
| ROSE TEABOUT +EXEMPT | 3F | |
| DONALD WILSON | 3J | |
| KARENA NICHOLAS -DREAGAN | 3L | |
| DANIEL LUGO RODRIGUEZ | 3M | |
| SELMA KWARTLER +EXEMPT | 4C | 1 |
| VACANT | 4E | |
| EDYYARD HENDERSON | 5A | |
| CANDACE HANASI | 5X | |
| LENORA JOHNSON | 6K | |
| DAVID CHRISTOPHER | 7A | |
| William Green (NEW) | 7B | |
| P MCCRAE&J LORD +EXEMPT | 7C | |
| VICTOR GONZALES | 7D | |
| CHERYL SULLIVAN +EXEMPT | 7E | |
| ETELKA BATTA +EXEMPT rent & 88 | 7F | |
| NANCY STRINGHAM +EXEMPT $894.15 | 7H | 1 |
| JASON WEST | 9A | |
| 832 warburton totals | | |

WARBURTON·TENANT LIST

| | | |
|---|---|---|
| G  ANGELINA MITCHELL  ✳EXEMPT | 2E | 1 |
| FRANK GRANT  ✳EXEMPT | 2F | |
| ADELAIDE TELLEH | 2J | |
| JOHN LARKIN  ✳EXEMPT | 2K | 1 |
| ARNOLD/SHARAE BELTON ✳EXEMPT | 2L | |
| PATRICIA/ANDRE MASON ✳EXEMPT | 3E | 2 |
| NICK CURANAJ | 5D | |
| WILLIAM TISHELMAN  ✳EXEMPT | 5I | 2 |
| LAWRENCE TERRY | 5M | |
| SAKINA ALLEN  ✳EXEMPT | 7E | 2 |
| ATCHON CACA | 7J | |
| DANIEL MELENDEZ (RENT INCR 8/1/2018) | 7K | |
| 850 Warburton totals | | |

WARBURTON-TENANT LIST

| | | |
|---|---|---|
| LEVERN/MATTIE GAMBLE  *EXEMPT | 2E | 3 |
| ALEXANDER ARTUSO | 2J | |
| GAIL BAXTER  *EXEMPT | 2L | 1 |
| DIANE SCHRADER  *EXEMPT | 4F | 2 |
| CAROL BOHAN  *EXEMPT (884.18) | 4H | 1 |
| ERICA MUNGER/EI SHAMA MCNEAL | 4J | |
| Rosa Peguero | 5D | |
| JACK TOON | 5G | |
| BARARA CANTOR *EXEMPT | 5I | 1 |
| ARETA ANNMARIE REID | 6A | |
| FELICIA SMITH | 6D | |
| James SMITH | 6F | |
| EUSEBRO CASTRO *EXEMPT | 6H | |
| FRANCESCA LORENZ *EXEMPT | 6I | 2 |
| LOUIS DERINO  *EXEMPT (669.10) | 6L | 2 |
| STEVEN DICKER *EXEMPT | 7D | 1 |
| SOPHIA EWART | 7E | |
| ALFONSO MARKU | 7H | |
| | | |
| 678 warburton -totals | | 24 |

EXHIBIT D

ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF LEASE ("**Agreement**") is made as of the ____ day of _____, 2019 (the "**Closing Date**"), between Oxford Associates Group, Inc., a New York Corporation, with an address at 5 West 37th Street, New York, NY 10016 ("**Assignor**"), and _____ a _____ limited liability company ("**Assignee**"), whose address is _____.

## W I T N E S S E T H:

WHEREAS, by Purchase and Sale Agreement (the "**Sale Agreement**") dated as of _____, 2019 between Assignor and Assignee, Assignee has agreed to purchase from Assignor on the Closing Date, and Assignor has agreed to sell to Assignee on the Closing Date, certain property, as more particularly described in the Sale Agreement (the "**Property**");

WHEREAS, the Sale Agreement provides, *inter alia*, that Assignor shall assign to Assignee as of the Closing Date Assignor's interest in those certain occupancy leases set forth on **Schedule 1** annexed hereto (the "**Leases**"), and Assignee shall accept such assignment and assume the obligations of the landlord under the Leases first accruing and arising as of the Closing Date.

NOW THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto hereby agree as follows:

1.     Assignor hereby assigns, sets over and transfers unto Assignee to have and to hold from and after the date hereof all of the right, title and interest of Assignor in, to and under the Lease, including, without limitation, all of the right, title and interest of Assignor in and to any security deposit, prepaid rent or other sums held by Assignor as the landlord under the Leases, and Assignee hereby accepts the within assignment and assumes and agrees with Assignor to perform and comply with and to be bound by, from and after the Closing Date, all the terms, covenants, agreements, provisions and conditions of the Leases which first accrue and arise from and after the date hereof on the part of the landlord thereunder to be performed.

2.     To the fullest extent permitted by law, Assignor hereby unconditionally, absolutely and irrevocably agrees to indemnify, defend and hold Assignee harmless of, from and against any and all costs, claims, obligations, damages, penalties, causes of action, losses, injuries, liabilities and expenses, including, without limitation, reasonable attorneys' fees (collectively, "**Claims**"), arising or accruing under the Leases to the extent and only to the extent such Claims arise out of or relate to the period prior to the Closing Date.

3.     To the fullest extent permitted by law, Assignee hereby unconditionally, absolutely and irrevocably agrees to indemnify, defend and hold Assignor harmless of, from and against any Claims arising or accruing under the Leases to the extent and only to the extent such Claims first accrue and arise out of or relate to the period on and after the Closing Date.

4.      All rentals and amounts constituting additional rent received by Assignor, as seller and Assignee, as purchaser after the date hereof and relating to periods prior to the Closing Date shall be apportioned in accordance with Article 11 of the Sale Agreement.

5.      Assignor hereby indemnifies and holds Assignee harmless from any claim, loss or damage (including legal fees incurred) relating to a tenant or former tenant as to any rent security and/or interest thereon not turned over/credited to Assignee this date; and Assignee hereby indemnifies and holds Assignor harmless for any such claim, loss or damage (including legal fees incurred) to the extent the rent security and interest thereon relating to such tenant or former tenant was turned over/credited to Assignee this date.

6.      This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. shall not be modified except by agreement in writing executed by all parties hereto and shall be governed by the laws of the State of New York.

7.      This Agreement may be executed by the parties hereto in one or more counterparts, each of which shall be an original and all of which shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

ASSIGNOR:

Oxford Associates Group, Inc., a New York Corporation

By:_____
    Name:  George Kyriak
    Title:   President

ASSIGNEE:

_____, a _____ limited liability company

By:_____
    Name:
    Title:

EXHIBIT E

NOTICE TO TENANT

TO BE PROVIDED BY PURCHASER

EXHIBIT F

LEAD PAINT RIDER

## DISCLOSURE OF INFORMATION ON LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS

Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

### SELLER'S DISCLOSURE

A)   Presence of lead-based paint hazards
     (*check either i or ii below*):

_____   i)   Known lead-based paint and/or lead-based paint hazards are present in the Unit.

_X_   ii)   Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the Unit being purchased.

B)   Records and reports available to the Seller
     (*check either i or ii below*):

_____ i) Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the Unit (list documents below).

_____

_____

X  ii)   Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the Unit.

### PURCHASER'S DISCLOSURE (Initial)

_X_ A)  Purchaser has received copies of all information listed above.

_X_ B)  Purchaser has received the pamphlet entitled "*Protect Your Family from Lead*".

C) Purchaser has: (*check either i or ii below*)

       i)    received a ten (10) day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint or lead-based paint hazards in the Unit.

 X  ii)    waived the ten (10) day inspection period.

## AGENT'S ACKNOWLEDGMENT (Initial)

       (i)    Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

## CERTIFICATION OF ACCURACY

     The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is accurate.

SELLER:              PURCHASER:

OXFORD ASSOCIATES GROUP, INC.

By: _____    By: _____

**EXHIBIT "C" TO BIDDING PROCEDURES ORDER**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

In re:                                          Chapter 11
OXFORD ASSOCIATES GROUP, INC.,                  Case No. 17-12487 (MKV)


                          Debtor

-------------------------------------------------------x

**NOTICE OF AUCTION, HEARING AND BIDDING PROCEDURES IN CONNECTION
WITH SALE OF DEBTOR'S INTERESTS IN SHARES OF COOPERATIVE STOCK
ALLOCATED TO FIFTY (50) APARTMENTS LOCATED AT 632, 650 AND 678
WARBURTON AVENUE, YONKERS, NEW YORK, TOGETHER WITH THE
APPURTENANT PROPRIETARY LEASES AND OCCUPANCY SUBLEASES,
FREE AND CLEAR OF ALL LIENS, ENCUMBRANCES AND INTERESTS,
<u>SUBJECT TO HIGHER AND BETTER OFFERS</u>**

       **PLEASE TAKE NOTICE** that, on _____, 2019, an Order (the "Bidding
Procedures Order") was entered by the United States Bankruptcy Court for the Southern District
of New York (the "Bankruptcy Court") in connection with the above-captioned chapter 11 case,
approving the Sale Procedures attached hereto in connection with debtor Oxford Associates
Group, Inc.'s (the "Debtor") auction sale of certain of its Property (as hereinafter defined), free
and clear of all liens, encumbrances and interests.

       **PLEASE TAKE FURTHER NOTICE** that the property being sold (collectively, the
"Property") consists of and is described generally as follows:

       All of the Debtor's rights, title and interest in and to 27,942 shares of cooperative
       stock in Hudson View Owners Corp. allocated in blocks to the following fifty
       (50) apartments (the "Apartments") in the buildings located at 632, 650 and 678
       Warburton Avenue, Yonkers, New York 10701, together with the appurtenant
       proprietary leases and existing subleases with occupants of the Apartments[1]:

- 632 Warburton Avenue – Units 3B, 3C, 3D, 3F, 3J, 3L, 3M, 4C, 4E, 5A,
  5K, 6K, 7A, 7B, 7C, 7D, 7E, 7F, 7H and 8A.

- 650 Warburton Avenue – Units 2E, 2F, 2J, 2K, 2L, 3E, 5D, 5I, 5M, 7E, 7J
  and 7K.

- 678 Warburton Avenue – Units 2E, 2J, 2L, 4F, 4H, 4J, 5D, 5G, 5I, 6A,
  6D, 6F, 6H, 6I, 6L, 7D, 7E and 7H.

---

[1] The Apartments consist of two (2) studios, twenty-three (23) 1 bedroom/1 bathroom, nine (9) junior 4, thirteen (13)
2 bedroom/2 bathroom, and three (3) 2 bedroom/1 bath units located in three (3), nine (9) story, elevator apartment
buildings containing two hundred forty eight (248) total units. Twenty-nine (29) of the Apartments units are "free
market" and the other twenty-two (22) units are rent stabilized.

**PLEASE TAKE FURTHER NOTICE** that a $3,515,000 "stalking horse" bid for the Property and a corresponding Purchase and Sale Agreement (the "PSA") has been approved as to form by the Bankruptcy Court and any entity wishing to place a higher or better bid for the Property shall do so only in accordance with the attached Sale Procedures.

**PLEASE TAKE FURTHER NOTICE** that in the event that the Debtor receives, by the Qualifying Deadline (as defined in the Sale Procedures), one or more submissions/competing bids that the Debtor determines to be from Pre-Qualified Bidders (as defined in the Sale Procedures), the Debtor shall conduct an auction, in accordance with the Sale Procedures, on **March 15, 2019 at 10:00 a.m. (Eastern)** at the offices of Pick & Zabicki LLP, 369 Lexington Avenue, 12th Floor, New York, New York 10017, for the purpose of determining the highest and best offer for the Property (the "Auction").

**PLEASE TAKE FURTHER NOTICE** a hearing (the "Hearing") has been scheduled to be held on **March ____, 2019 at 10:00 a.m. (Eastern)** before the Honorable Mary Kay Vyskocil, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, to consider the Debtor's motion (the "Sale Approval Motion") for approval of the sale of the Property to the Successful Bidder therefor at the Auction, together with such other and further relief as may be just and proper.

**PLEASE TAKE FURTHER NOTICE** that objections if any, to the approval of the proposed sale shall (a) be made in writing, (b) conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, (c) set forth the basis for the objection and the specific grounds therefor, (d) identify the party objecting and its alleged interest in the Debtor's chapter 11 case; (e) be filed with the Court with a copy to the chambers of the Honorable Mary Kay Vyskocil, together with proof of service thereof, and (f) be served in a manner so as to be received by the Debtor's undersigned counsel not later than **March ____, 2019 at 5:00 p.m. (Eastern).**

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures Order, the PSA and the Sale Approval Motion, are on file with the Clerk of the Bankruptcy Court and may be examined by interested parties during hours established by the Clerk of the Bankruptcy Court therefor, or may be viewed online by accessing the docket for the above-captioned chapter 11 case through the Bankruptcy Court's website (http://ecf.nysb.uscourts.gov (registered users) and/or http://pacer.psc.uscourts.gov (unregistered users)). Copies of said documents, as well as all other documents available with regard to the proposed sale of the Property, may also be obtained upon request to the Debtor's undersigned counsel.

Dated: New York, New York
       _____, 2019

                                      **BY ORDER OF THE COURT:**
                                      **PICK & ZABICKI LLP**
                                      Counsel to the Debtor
                                      369 Lexington Avenue, 12th Floor
                                      New York, New York 10017
                                      (212) 695-6000
                                      dpick@picklaw.net

**EXHIBIT "D" TO BIDDING PROCEDURES ORDER**

**BANKRUPTCY SALE – 50 COOP APARTMENTS IN YONKERS**

Pursuant to an Order entered by the U.S. Bankruptcy Court, S.D.N.Y. on _____, 2019 in In re Oxford Associates Group, Inc., 17-12487, an auction sale will be conducted on March 15, 2019 at 10:00 a.m. at Pick & Zabicki LLP, 369 Lexington Ave., 12th Fl., NY, NY, of debtor Oxford Associates Group., Inc.'s interests in the coop stock, proprietary leases and occupancy leases for 50 apartments located at 632, 650 and 678 Warburton Ave., Yonkers, NY, 2 studios, 23 1 bed/1 br, 9 jr 4, 13 2 bed/2 br, 3 2 bed/1 br, in 3, 9-story, elevator buildings with 248 total units. 29 units are free market and rest are rent stabilized. Sale is as is, where is.  Initial overbid is $3,615,000 all cash w/out contingencies for financing or due diligence.  Bidders must be pre-qualified and must submit qualifying materials by March 13, 2019.   The auction may be cancelled or rescheduled without notice.  Additional information and documents can be obtained by contacting Douglas J. Pick, Esq., (212) 695-6000, Ext. 223, dpick@picklaw.net, or by accessing the court' website at www.nysb.uscourts.gov.